IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel, EDWARD O'DONNELL, appearing QUI TAM, | ) ) ) ) | FILED UNDER SEAL |
| Plaintiff/Relator, | ) ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE BANK FSB; BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A. | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Relator Edward O'Donnell ("Relator") brings this qui tam action, and related causes of action, on behalf of the United States of America, against Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank FSB, Bank of America Corporation, and Bank of America, N.A. (collectively referred to herein as "Bank of America"), alleging for its Complaint as follows:

## INTRODUCTION

1.      This is a qui tam action under the False Claims Act ("FCA") by the United States of America, by Relator Edward O'Donnell, to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq.*, arising from fraud on the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") in connection with Bank of America's residential mortgage lending business, in particular the Consumer Marketing Division.

2.       As set forth more fully below, Bank of America has profited for years from its position as one of the nation's largest residential mortgage lenders while submitting false statements to Fannie Mae and Freddie Mac about its documentation, underwriting and its quality control. At the same time, Bank of America failed to implement quality control measures to stop the reckless lending that Bank of America engaged in. Not only has Bank of America's misconduct cost the United States millions of dollars, with additional losses expected in the future, but also it has led to mortgage defaults and home evictions and foreclosures across the country.

## PARTIES

3.       Relator Edward O'Donnell is a citizen of the United States and resides in the State of Pennsylvania, and pursuant to the aforementioned statutes, brings this action on behalf of the United States of America.   From 2003 to 2009, Relator was employed by Bank of America or one of its predecessors and/or an affiliated company. From 2010 to the present, Relator has been employed by Fannie Mae. While employed by Bank of America, Relator served as Executive Vice President and Senior Vice-President, including reviewing and monitoring the underwriting of loans and risk management relating to loans. At Fannie Mae, he has served as Vice President with oversight and management of its credit risk.

4.       Defendant Countrywide Financial is a Delaware corporation with its principal place of business in Calabasas, California. Countrywide Financial, by itself or through its subsidiaries Countrywide Home Loans, Inc. and Countrywide Bank, FSB, was engaged in mortgage lending. On July 1, 2008, Countrywide merged with Bank of America and is now a wholly-owned subsidiary of Bank of America. Countrywide Financial's remaining operations

and employees were transferred to Bank of America, and Bank of America ceased using the Countrywide name in April, 2009.

5.     Defendant Countrywide Home Loans, a wholly-owned subsidiary of Countrywide Financial, is a New York corporation with its principal place of business in Calabasas, California. Countrywide Home Loans originates and services residential home mortgage loans by itself or through its subsidiaries. Pursuant to the merger on July 1, 2008, Countrywide Home Loans was acquired by Bank of America and now operates under the trade name "Bank of America Home Loans."

6.     Defendant Countrywide Bank, a wholly-owned subsidiary of Countrywide Financial, is a federally-insured financial institution with its headquarters in Colorado. In 2006 and 2007, Countrywide Home Loans transitioned its mortgage loan production business into Countrywide Bank. As Countrywide Financial stated in its Form 10-K for 2007, by the end of 2007, nearly all mortgage loan production occurred in Countrywide Bank rather than Countrywide Home Loans. Pursuant to the merger on July 1, 2008, Countrywide Bank later merged into and with BANA, with BANA as the surviving entity, effective on or about April 27, 2009.

7.     Defendant Bank of America Corporation is a Delaware corporation with its principal place of business in Charlotte, North Carolina and offices and branches in New York, New York. Countrywide Financial merged with Bank of America Corporation on July 1, 2008. As explained more fully below, Bank of America Corporation is a successor-in-interest to Countrywide and has thus assumed liability for the conduct of Countrywide alleged herein.

8.     Defendant BANA is a federally-insured financial institution and Bank of America's principal banking subsidiary. BANA has substantial business operations and offices

in New York, New York. As explained more fully below, BANA participated in Bank of America's acquisition of substantially all of Countrywide Financial through a series of transactions that commenced on July 1, 2008. Together with Bank of America Corporation, it is a successor-in-interest to Countrywide.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, and the FCA, particularly 31 U.S.C. §3732(a), which specifically confers jurisdiction over actions brought pursuant to 31 U.S.C §3729 and §3730, and further, personal jurisdiction, in that some or all of the acts proscribed by §3729 as alleged herein occurred in the New York City, New York, and further, Defendants and each of them may be found in the District and transact business in this District as set forth above.

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391 and 31 U.S.C.§ 3732(a) because Defendants are found, transact business, and committed the acts alleged herein and proscribed by 31 U.S.C § 3729 in this District.

## CONDITIONS PRECEDENT

11.     Pursuant to 31 USC § 3729 et seq, this Complaint is to be filed *in camera* and under seal, and is to remain under seal for a period of at least sixty days and shall not be served on Defendants until the Court so orders. Further, the United States of America may elect to intervene and proceed with the action within the sixty day time frame after it receives both the Complaint and the material evidence submitted to it.

12.     The allegations in this suit are not based on prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in

4

the news media; or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730, but rather information from Relator.

13.     In the alternative, to the extent there has been a public disclosure unknown to Relator is an original source under the aforementioned statute.  As more fully set forth in this Complaint, Relator has direct and independent knowledge of the information on which the allegations herein are based, and witnessed directly the actions and representations by Bank of America against the United States, its departments or agents.

14.     Relator has voluntarily provided all of the material information alleged herein to the Federal government before filing this action based on said information.

15.     Contemporaneous with filing this Complaint, Relator is serving a copy of same upon the United States, together with the aforementioned verbal and written disclosure statements setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

16.     Relator has complied with all other conditions precedent to bringing this action.

## BACKGROUND

### A.     The Conservatorships of Fannie Mae and Freddie Mac

17.     Fannie Mae and Freddie Mac are GSEs chartered by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets. Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

18.     As part of their mission, Fannie Mae and Freddie Mac purchase single-family residential mortgages from mortgage companies and other financial institutions, providing revenue that allow the mortgage companies to fund additional loans.  The GSEs then either hold

the loans in their investment portfolios or bundle them into mortgage-back securities ("MBS") that they sell to investors.

19.     The GSEs earn revenue in their single-family business line primarily from "guarantee fees." *i.e.*, fees received as compensation for guaranteeing the timely payment of principal and interest on mortgage loans pooled into MBS. In general, the GSEs are profitable so long as their income from investments and guarantee fees exceeds the principal and interest that they must pay out on any defaulted loans that they guarantee.

20.     Prior to late 2007, GSE preferred stock was widely regarded to be a safe investment. In fact, federal regulators permitted banks to invest up to 100 percent of their investment capital in GSE preferred securities. In the second half of 2007 and the first half of 2008, however, as default rates on defective loans climbed, Fannie Mae lost $9.5 billion and Freddie Mac lost $4.7 billion. Accordingly, Fannie Mae's Form 10-K for 2007 reported a "material increase in mortgage delinquencies and foreclosures. . ." and expected "increased delinquencies and credit losses in 2008 as compared with 2007."

21.     On July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. §4617), Congress created the Federal Housing Finance Agency ("FHFA"), a federal agency, to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks. The FHFA is located at Constitution Center, 400 7th Street, SW in Washington, D.C.

22.     On September 6, 2008, pursuant to HERA and in response to the insolvency of the GSEs due to mortgage defaults and delinquencies, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorships and appointed FHFA as conservator. In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs. 12 U.S.C. §4617(b)(2).

23.     Simultaneous with the placement of Fannie Mae and Freddie Mac into conservatorships, the United States Department of Treasury ("Treasury") exercised its authority under HERA "to purchase any obligations and other securities" issued by the GSEs and began to purchase preferred stock pursuant to the Senior Preferred Stock Purchase Agreements ("PSPAs").

24.     On September 7, 2008, following the conservatorship of Fannie Mae and Freddie Mac and Treasury's purchase of GSE preferred stock, the value of the GSEs' stock was eliminated.

25.     Since the conservatorship, Treasury has made quarterly capital contributions to each of the GSEs.  As of December 31, 2012, Treasury has provided more the $187 billion in support to the GSEs.  These federal funds have been used primarily to cover losses from single-family mortgages purchased and guaranteed by the GSEs between 2004 and 2008, but have also been used to purchase mortgages sold in 2009 from lenders including Defendants, and to reimburse losses incurred by the GSEs as a result of their guaranteeing those mortgages.

**B.      The GSEs' Single Family Mortgage Guarantee Business**

26.     In purchasing loans for their single family business, GSEs operate on a "rep and warrant model," relying on lenders' representations and warranties that their loans comply in all respects with the standards outlined in the GSE selling guides and lender sales contracts, which set forth underwriting, documentation , quality control, and self-reporting requirements. Specifically, loans sold to Fannie Mae must comply with its Single Family Selling Guide (the "Selling Guide") and purchase contracts.  Loans sold to Freddie Mac must comply with its Single-Family Seller/Servicer Guide (the "Freddie Guide") and purchase contracts.

27.     The purchase contracts between a GSE and a lender include both a long-term master agreement that supplements the relevant selling guide and short-term contracts that grant variances or waivers from the selling guide requirements to permit a lender to sell a specific loan product.    The GSEs typically renegotiate such variances on an annual basis based on the performance of the applicable loan product and other factors, and may decide to adjust the pricing on the affected loans for the following year or eliminate the variance altogether.

28.     The rep and warrant model operates on the assumption that the sellers of the loans – usually also the originators of the loans – are in a superior position of knowledge about the quality of those loans.   Lenders assume certain obligations in accordance with their superior position of knowledge, such as the duty to perform prudent underwriting and quality assurance checks as required by the guidelines, and to self-report loans they identify as fraudulent, noncompliant with GSE guidelines, or otherwise materially defective.   The GSEs also delegate the underwriting of the loans they purchase to the lenders.   Although the GSEs reserve the right to sample a portion of loans they purchase to ensure compliance with their guidelines, they generally conduct full file reviews only if a loan goes into default.

29.     As set forth in the Mortgage Selling and Servicing Contract (the "Master Contract") between Countrywide Home Loans and Fannie Mae, the "specific warranties made by the Lender" are (among other things) the "[t]he mortgage conforms to all the applicable requirements in [the] Guides and this Contract" and that "[t]he lender knows of nothing involving the mortgage, the property, the mortgagor or the mortgagor's credit standing that can reasonably be expected to: [i] cause private institutional investors to regard the mortgage as an unacceptable investment; [ii] cause the mortgage to become delinquent; or [iii] adversely affect the mortgage's value or marketability."   These representations were first made in a contract

executed by Lee Bartlett of Countrywide and Norman Peterson of Fannie Mae in November of 1982 and were reaffirmed through addenda and new contracts executed in 2006, 2007, and 2008, by Kevin Bartlett and Gregory Togneri of Countrywide.

30.     As set forth in the relevant agreements, Countrywide's representations "appl[ied] to each mortgage sole to [Fannie Mae] . . .in its entirety," were "made as of the date transfer is made," and "continue after the purchase of the mortgage."

31.     In representing to Fannie Mae that the loan sold to the GSEs is an acceptable investment, Countrywide (and later Bank of America) further warranted that: (i) all required loan data is true, correct, and complete; (ii) automated underwriting conditions are met for loans processed through an automated underwriting system; and (iii) no fraud or material misrepresentation has been committed by any party, including the borrower. These requirements were set forth in the 2007 and 2008 versions of the Selling Guide, and remain in effect today.

32.     Countrywide further warranted that its quality control department takes certain post-closing measures intended to detect problems with loan manufacturing quality, including: (i) reviewing data integrity within automated underwriting systems; (ii) re-verifying underwriting decisions and documents; (iii) re-verifying fieldwork documents (including as to appraisal and title); (iv) reviewing closing and legal documents; and (v) conducting regular reviews of internal controls relating to loan manufacturing quality and fraud prevention. These requirements were set forth in the versions of the Selling Guide operative in 2007 and 2008.

33.     Similarly, the Freddie Guide provides the "[a]s of the Delivery Date, the Funding Date and the date of any substitution of Mortgages pursuant to the Purchase Documents, the Seller warrants and represents the following for each Mortgage purchased by Freddie Mac: (1) the terms, conditions, and requirements stated in the Purchase Documents [defined to include the

guidelines and contracts] have been fully satisfied; (2)  All warranties and representations of the Seller are true and correct; (3) The Seller is in compliance with its agreements contained in the Purchase Documents; [and] (4) The Seller has not misstated or omitted any material fact about the Mortgage."   These representations were set forth in the versions of the Freddie Guide operative in 2007 and 2008.

34.     The Master Agreement between Freddie Mac and Countrywide Home Loans operative in 2007 and 2008, and signed by Kevin Bartlett and Greg Togneri of Countrywide, provides that the "Seller must comply with all requirements of the *Freddie Mac Single-Family Seller/Servicer Guide* and the other Purchase Documents, as modified and supplemented by the terms of this Master Commitment."

35.     Countrywide's (and later Bank of America's) representations that they were underwriting and delivering investment-quality mortgages according to the GSEs' selling guides and contractual requirements were material to the GSEs' decisions to purchase mortgage loans.

36.      The GSE guidelines are consistent with Countrywide's own underwriting guidelines, which are set forth in two main documents: the Loan Program Guides ("LPGs") and the Countrywide Technical Manual ("CTM").  The LPGs set limits on loan characteristics, such as loan-to-value ratios ("LTVs"), loan amounts, and reserve requirements for specific loan types. The CTM contains processes and instructions for originating loans, such as how to calculate LTVs.

37.     The CTM states that Countrywide's basic policy is to "originate and purchase investment quality loans," with such a loan defined as "one that is made to a borrower from whom timely payment of the debt can be expected, is adequately secured by real property, and is

originated in accordance with Countrywide's Technical Manual and Loan Program Guides." CTN 0.4 Introduction – Countrywide's Underwriting Philosophy.

38.     When a GSE identifies a material breach of a warranty, usually during a post-default quality review of a loan, it may demand that the lender repurchase the loan and/or reimburse the GSE for any loss incurred.

### C.     Prior Litigation Involving Full Spectrum Lending

39.     In an analogous case, the United States of America intervened and prosecuted a case against Defendants relating to Defendants' Full Spectrum Lending Division in the United States District Court for the Southern District of New York, Cause No. 12-CV-1422 (JSR).

40.     Relator assisted the Government and testified in that case.  That case addressed Defendants' Full Spectrum Lending division.

41.     On October 23, 2013, a jury rendered a verdict, finding Defendant Bank of America liable for fraud as to the Full Spectrum Lending division.

42.     As outlined below, the conduct that took place in the Full Spectrum Lending division also occurred in Defendants' Consumer Markets Division.

### D.     The Loan Origination Process Within CMD

43.     Within the Consumer Markets Division of Defendant, as of early 2005, the loan origination process required the involvement of four individuals:  the loan officer, the loan processor, the operations manager and the branch manager.

44.     The loan processor was responsible for entering information into Countrywide's automated mortgage underwriting system (called "CLUES).  Based upon data entered from a borrower's loan application, credit report and appraisal, CLUES evaluated a loan's default risk and whether a loan could be approved in compliance with Countrywide's guidelines.  CLUES

then generated a report with either an "Accept" for a loan, indicating that the loan had an acceptable level of risk, or a "Refer," indicating that the loan should be referred to a human being for manual underwriting because of a borrower's credit score or other risk attributes on the loan.

45.    A CLUES report on a particular loan also listed underwriting conditions that were required to be satisfied before a loan could be closed.  For example, a CLUES report might condition its "Accept" on obtaining documentation showing that certain of the borrower's debts had been paid off, documentation of the borrower's employment and assets, or review of certain assumptions supporting an appraisal.

46.    After obtaining a CLUEs result, the loan processor would forwarded the loan file to an underwriter for review if CLUES had rendered a "Refer" decision which indicated a manual underwriting of the loan was required.

47.    For loan files receiving a CLUES Accept, the loan processor determined the likelihood that the borrower could repay the mortgage loan, by (i) verifying that loan documentation was true, complete, and accurate by comparing the underlying loan documentation with data entered into CLUES; (ii) evaluating documentation concerning the borrower's income, assets, employment, and credit history; (iii) evaluating the appraisal; (iv) analyzing GSE requirements; and (v) reviewing and clearing any conditions listed on a CLUES report until the loan was: cleared to close."

48.    The loan processor was also responsible for conducting other critical reviews including identification of potential fraud, misrepresentation of income or employment, compliance with federal and state lending requirements.  Specifically, the loan processor was required to detect whether a loan officer entered fraudulent data into CLUES by comparing the

loan documentation with the data entered by the loan specialist. The loan processor was also key to detecting fraud in stated income loans – those in which a borrower is not required to provide documentation supporting his or her income. Where a borrower provides no supporting documentation of income, the determination as to whether the borrower's stated income is reasonable in view of her employment and other factors is best made by a qualified, experienced underwriter.

49.     The loan processor also prepared the loan package for closing, coordinated the return of closing documents for review prior to funding, and ensured that any unresolved funding conditions were satisfactorily met, and wired funds to title companies or closing agents.

50.     The loan processor also was responsible for compliance reviews acting as a final "toll gate" prior to funding, by conducting a review of the loan filed to: (i) ensure that any conditions imposed by CLUES were properly satisfied; (ii) verify borrower identification and execution of loan documents; (iii) confirm the availability of funds to be paid to the borrower or third parties; and (iv) ensure compliance with relevant state lending requirements.

51.     As of early 2005, each of the four individuals involved in the loan origination process received a bonus based both on the quality and on the volume of loans processed.

E.     **The Shift in Focus to Prime, Conventional Lending in 2007**

52.     In the spring of 2007, the secondary market for subprime loans collapsed and several subprime lenders announced significant losses, declared bankruptcy, or put themselves up for sale. With the collapse of the subprime market, lenders sought to originate loans that they could then sell to the GSEs ("Conforming Loans"). After originating approximately $2 billion in Conforming Loans available for sale to the GSEs on a monthly basis in 2005 and 2006, CMD increased Conforming Loan volume to more than $3 billion per month in 2007 and more than

13

$3.5 billion per month in 2008. Similarly, production of "Expanded Approval" loans, a Fannie Mae product, doubled in 2007 to nearly $50 million per month from $22 million per month in 2006.

53.     Countrywide and CMD in particular continued to push loan production to record levels in spite of clear signals there were problems with early loan repayment performance. Each month, Countrywide produced "Delinquency and Loss Summary" reporting which detailed loan performance by product, division and origination vintage. Early loan performance clearly illustrated problems repayment of loans originated for sale to the GSEs. Conforming Loans classified as 90 days delinquent rose by more than 50% during the first twelve months after funding from 2005 to 2008 with virtually no change in risk profile as measured by average FICO score and Loan-to-Value ratio. More significant deterioration was seen in Conforming Loans with adjustable rates or stated income in CMD, with 90 day delinquencies more than tripling after just six months from funding. In spite of these internal warnings about borrowers defaulting at record rates, CMD and Countrywide pressed sales and underwriting staff to fund more loans faster.

54.     As Countrywide stated in its Form 10-K for 2007, "secondary mortgage market demand for non agency-eligible loans (nonconforming Prime Mortgage Loans, Prime Home Equity Loans and Nonprime Mortgage Loans) was substantially curtailed." Countrywide further stated that in response to changes in the secondary market, "we have tightened our underwriting and loan program guidelines, including reductions in the availability of reduced documentation loans. . ." Elsewhere in its Form 10-K, Countrywide stated that, as a "result of the changes to our underwriting and program guidelines, the vast majority of loans we now originate are eligible for sale directly to Fannie Mae, Freddie Mac, or Ginnie Mae. . ." In additional to its public

statements, employees in Countrywide's secondary marketing unit represented to individuals in the credit risk management groups at both Fannie Mae and Freddie Mac in the fourth quarter of 2007 that it had implemented tighter underwriting guidelines.

55.     Consistent with Countrywide's shift to the prime, conventional lending market – effectively the only secondary market that remained – CMD transitioned from both a subprime and prime origination division to one that originated loans for sale of HUD approved products. By early 2008 CMD's transition was complete, as CMD's  production by the first quarter of 2008 consisted of more than 90% conventional loans and other GSE-approved products.

56.     The GSEs, for their part, began to observe escalating default rates in previously-purchased loans and responded by tightening their requirements and curtailing the purchase of riskier loans.   The GSEs also communicated these tightened requirements to lenders.   For example, Fannie Mae's 2007 10-k Investor Summary lists several "Management Actions on Credit," with the top action being "Tightening underwriting standards/reduced participation in riskier segments."

57.     In an attempt to mitigate its anticipated losses, Fannie Mae also stated that it was "[s]trengthening contractual protections" with lenders, placing "[n]ew limits on business with some counterparties," and "[i]creas[ing] depth and frequency of monitoring" of the quality of sellers' loans.  As one former Fannie Mae executive explained the changing expectations in mid-2007, Fannie Mae was nearly the only significant purchases left in the secondary market and was working hard to provide liquidity to the market, so it demanded that lenders pay closer attention to loan quality.

58.     Countrywide was by far the largest seller of single-family loans to Fannie Mae in 2007, accounting for approximately 28% of Fannie Mae's single-family loan purchases.  At the

same time, Countrywide's loans performed far more poorly than those originated by other major lenders. Countrywide-originated loans sold to Fannie Mae in 2007 had a serious delinquency rate (loans that are three months past due or in foreclosure) of more than 21 percent, which was two to three times the rate of other major sellers during that time period.

59.     In light of Countrywide's financial distress in mid-2007, Fannie Mae disclosed its relationship with Countrywide as a material risk to its financial condition in its Form 10-K for 2007. Fannie Mae knew that if Countrywide had failed to repurchase defective loans or defaulted on other significant obligations, it could expose Fannie Mae to significant losses given the volume of Countrywide loans Fannie Mae held and the high serious delinquency rate on those loans. Fannie Mae therefore also initiated a thorough review of the Countrywide portfolio, and directed its employees to "reduce[] the existing level of risk by pulling back on products and variances." Similarly, as loan default rates continued to climb, Freddie Mac re-priced, then eliminated, approximately half of Countrywide's riskier loan products in 2007 and 2008.

60.     Countrywide was well aware of the tightened underwriting requirements in the secondary market. On August 7, 2007, Andrew Gissinger, executive managing director of Countrywide Home Loans, sent a memo to all employees (the "Gissinger Memo") stating that "[w]e must ensure that our guidelines are fully in sync with the secondary markets, and therefore we will be continuing to announce guideline changes when we need to align ourselves to the overall market. Our success in the environment is absolutely contingent on our ability to employ rigorous underwriting discipline. We need to adapt our business to new market realities which requires ongoing manufacturing quality enhancement and further operating controls." One Countrywide risk manager similarly acknowledged in September of 2009 that "mfg quality is intense focus right now since FNMA delivery products in the only liquidity game in town."

61.     At the same time, however, to alleviate its financial distress, Countrywide sought to quickly boost sales volume and revenue.  To achieve this aim, Defendant knowingly sold loans with material underwriting defects to the GSEs to reduce its own exposure to losses through the transfer of credit risk to the GSEs and use the balance sheets of Fannie Mae and Freddie Mac as credit lines to fund its operations, enrich its executives and protect its position as the largest lender in the United States.

62.     Countrywide and later Bank of America conducted monthly loan quality and compliance audits on funded loans to assess adherence to loan underwriting guidelines,  identify material defects that may negatively impact on its ability to sell the loan to an investor, or negatively impact the borrower's ability to repay the loan.   Corporate Quality Control underwriters were responsible for re-underwriting funded loans and assessing compliance with loan underwriting guidelines, identifying any defects and assessing the critical nature of those defects to the investment quality of the file and the borrower's ability to repay the debt. Throughout the 2000's, both before and after Bank of America acquired Countrywide, loan audits conducted by Corporate Quality Control underwriters consistently identified defect rates above the corporate target levels of four percent (4%) for CMD production.  In fact, in 2009, 2010 and 2011, well after the credit crisis had materialized, hundreds of mortgage lenders had filed bankruptcy and thousands of repurchase requests had been issued to Countrywide, loan quality audit material finding rates continued to be well above ten percent (10%) for conforming loan products which were sold to the GSEs.

63.     As delinquencies began to spike in 2007, Countrywide Management had its Credit Risk Leadership team review recent production to determine where the problem "prime" loans were being originated.   The presentation summarizing the conclusions of that review indicated

CMD was the problem with "No Pay" rates in CMD more than four times higher for "prime" loans than its Correspondent Division, which purchased closed and funded prime loans from other lenders. In spite of these internal warnings about borrowers defaulting at record rates, CMD and Countrywide pressed sales and underwriting staff to fund more loans faster.

64. Relator regularly received copies of Corporate Quality Control audit summaries that identified the high defect rate at CMD for all loan products, including Conforming Loans sold to the GSEs. They also visited CMD branch and regional operations centers (known in CMD as ROCs) in California, Arizona, Texas and Chicago where CMD loans were processed and funded. During the course of those visits which were intended to share "best practices" used to achieve funding goals, Relator interviewed management and staff about loan funding processes and work flows, quality control points including the clearing of underwriting conditions, the duties of staff employees and their authority relating to the "underwriting" and funding of loans. Through those interviews and other direct interaction with CMD trained employees, Relator determined CMD work flows and ineffective controls, while assisting in achieving loan volume production targets, were a root cause of SUS rate, which indicated loans were ineligible for sale to an investor being well above ten percent (10%), more than twice the company standard.

65. Countrywide, and later Bank of America, produced Quality Control reports on a monthly basis that summarized the results of audits conducted by underwriters from the Corporate Quality Control group. In spite of its public statements that underwriting quality had been tightened in response to market conditions, Quality Control audits told a different story. Internal QC reporting illustrates that monthly audits conducted on Conforming Loans originated

for sale to the GSEs through July of 2011 contained material defect rates of two to three times the corporate target of four percent.

66.    Compounding the defect finding rate, Countrywide also discovered that those rates may actually be understating the percentage of loans being originated with defects that may make them ineligible for investor sale.  As part of the Credit Risk Leadership investigation into credit quality, Countrywide discovered that QC underwriters were citing loans as "Severely Unsatisfactory" appropriately.  A review of 15 "no pay" loans indicated that the QC underwriter had incorrectly graded the loans as acceptable risk in 11 cases causing Credit Risk Leadership to question the competency of QC underwriters, the adequacy of their training and the impact of production divisions aggressively rebutting initial QC ratings to reduce finding rates.

67.    Countrywide's Credit Risk Leadership noted that CMD had limited penalties within its bonus programs for underwriters and managers who were involved in funding non-investment grade loans compared to other divisions.  Their summary compared the bonus impacts of loans rated by Corporate QC as "SUS" and noted that in CMD, bonuses for branch employees could be reduced by a maximum of only 50%, even if 100% of audited loans were rated as "SUS" while its other divisions would have paid no bonus to employees with the same results.  The review further highlighted the fact that loans that were required to be repurchased from investors, including the GSEs, had no negative impact to the compensation of division underwriting or production employees.

68.    After the credit crisis devastated the single family mortgage market, Fannie Mae and Freddie Mac provided more than ninety percent (90%) of the liquidity to lenders through the purchase of monthly production.  Both GSEs purchased tens of thousands of loans on a monthly basis and were thus unable to re-underwrite each loan prior to its purchase.  Instead, they relied

upon the representations and warrants made by lenders, including Countrywide and later Bank of America that loans made available for purchase were underwritten to their guidelines subject to any variances granted by a GSE.  Loans identified during post purchase reviews having material underwriting defects would be required to be repurchased by the lender.  The GSEs generally conducted these audits during the period from 2008 through 2012 when loans defaulted allowing Countrywide to conceal that it was knowingly selling defective CMD loans to the GSEs based on its own internal Quality Control Audits in a classic Trojan Horse scheme.  Only in the event a loan defaulted might the GSE select a loan for review and Countrywide would be forced to repurchase a loan only if they agreed to do so.

69.     By 2009, after Bank of America had completed its pre-purchase due diligence of Countrywide and ultimately completed the acquisition, loans sold to the GSEs by Countrywide, including those originated by its largest retail division CMD, began to default at an alarming rate.  Countrywide's scheme to saddle the GSEs with poorly underwritten loans didn't stop once the loan was sold.  The lender organized teams charged with rebutting GSE repurchase request to avoid repaying gains and profits earned through the origination and sale of loans to Fannie Mae and Freddie Mac.  Countrywide largely ignored GSE requests to repurchase defected even when their internal findings confirmed defects.

70.     Following the acquisition of Countrywide by Bank of America, Relator was offered a Senior Vice President position reporting to a former CMD Executive Vice President who was overseeing the build of a new organization responsible for managing the tidal wave of repurchase requests the bank was receiving.  The role, as presented to this member, would be responsible for challenging all GSE repurchase claims in an attempt to avoid repurchase and minimize cost to the bank.  Success in the position was described to the relator as avoiding

repurchase no matter the defect. The former CMD Executive Vice President communicated his confidence that the GSEs were not staffed or equipped for large scale loan reviews and would be challenged at enforcing repurchase requirements. This person declined the job offer.

### Examples

71.     Loan # xxxxxx0538, New River, AZ. Funding date: 3/12/2010. Issue: Early payment default, unacceptable appraisal. Detail: post funding review of loan identified that comparable properties used on original appraisal as well as adjustments made by appraiser were inappropriate. Subsequent appraisal lowered value by 39% creating a Loan to Value ratio of 132% and not 80% as submitted to GSE.

72.     Loan # xxxxx1835, Fairfax, VA. Funding Date 10/26/2011. Issue: Early payment default, misrepresented occupancy. Detail: post funding review of loan identified that borrower had been terminated from job 2 weeks prior to closing and moved across country. Bank statements in file showed new address confirming property was an investment property and not owner occupied.

73.     Loan # xxxxx5247, Flagstaff, AZ. Funding Date 06/25/2009. Issue: Early payment default, foreclosure, misrepresentation of income. Detail: post funding review of loan indicated stated income of $5,000 per month for W-2 employee was not valid. Income verification confirmed monthly income was $1,300.

74.     Loan # xxxxx4446, Fallbrook, CA. Funding Date 4/25/2008. Issue: Income calculated incorrectly. Detail: post funding review identified income rental income was calculated incorrectly giving borrower credit for rental income more than twice the level shown on lease. Resulting debt to income ratio was 64%.

75.    Loan # xxxxx2213, Lambertville, NJ.    Funding Date 1/15/2008.    Issue: Unreasonable Stated Income.  Detail:  Construction company owner stating income of $27,700 per month deemed unsupported by credit profile, fico score and cash reserves.   Borrower received $106,000 cash out on refinance of "spec" home he built.

76.    Loan # xxxxx7431, Tucson, AZ.  Funding Date 1/28/2008.  Issue:  Unacceptable property condition.  Detail:  Appraisal noted deferred maintenance of property with cost to cure of nearly 10% of property's total value including damaged flooring, drywall, inoperable toilet and broken windows.  No requirement that repairs were made prior to closing.

**F.    Civil Statutes to Combat Mortgage Fraud**

77.    The False Claims Act provides liability for any person (I) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" 31 U.S.C. § 3729(a)(1)(A)-(B).  The False Claims Act further provides that any person who violates the Act: "is liable to the United States of America for a civil penalty of not less than [$5,500] and not more than [$11,000]..., plus 3 times the amount of damages which the United States of America sustains because of the act of that person..."  31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

**FIRST CLAIM**
**Violations of the False Claims Act**
**(31 U.S.C. § 3729 (a)(1) (2006), and, as amended, 31 U.S.C. § 3729 (a)(1)(A))**
**Presenting or Causing False Claims to Be Presented (Reckless Underwriting)**

78.    The Relator incorporates by reference paragraphs 1 through 78 of its Complaint as if fully set forth herein.

79.     Relator seeks relief against Bank of America under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. §3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. §3729(a)(1)(A).

80.     As set forth above, from 2008 to the present date, Bank of America engaged in a regular practice of reckless origination and underwriting of its Fannie Mae and Freddie Mac loans.  During that time Bank of America's senior management was aware of the very serious loan quality problems that the bank was experiencing with respect to it Fannie Mae and Freddie Mac loans.  Similarly, Bank of America's underwriters knew, or should have known, that a substantial portion of the bank's Fannie Mae and Freddie Mac loans during this time period did not meet the Fannie Mae and Freddie Mac loan program parameters, contained unacceptable risk, and were ineligible for Fannie Mae and Freddie Mac insurance.  Nonetheless, Bank of America certified Fannie Mae and Freddie Mac loans for insurance, and thereby falsely certified thousands of Fannie Mae and Freddie Mac loans were eligible for insurance when they were not.

81.     Bank of America knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, caused false or fraudulent claims for Fannie Mae and Freddie Mac insurance to be presented to an officer or employee of the United States of America.  Bank of America did so by, *inter alia*, submitting false loan-level certifications for Fannie Mae and Freddie Mac loans to HUD in order to get Fannie Mae and Freddie Mac to endorse these mortgages that did not meet HUD requirements and contained unacceptable risk for Fannie Mae and Freddie Mac insurance, and then selling the mortgage loans to third parties whom Bank of America knew would submit insurance claims in the event the mortgage loans defaulted.

82.     Bank of America knowingly, or acting with deliberate ignorance and/or reckless disregard for the truth, presented to an officer or employee of the United States of America false

or fraudulent claims for payment when it submitted claims for Fannie Mae and Freddie Mac insurance for defaulted loans that Bank of America falsely certified were eligible for Fannie Mae and Freddie Mac insurance.

83.     A truthful individual loan certification for Fannie Mae and Freddie Mac endorsement is a condition of payment of Fannie Mae and Freddie Mac insurance on that loan. HUD paid insurance claims, and incurred losses, on these retail Fannie Mae and Freddie Mac loans that Bank of America falsely certified were eligible for HUD insurance.

84.     By reason of the foregoing, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## SECOND CLAIM
### Violations of the False Claims Act
### (31 U.S.C. §3729(a)(2) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(B))
### Use of False Statements in Support of False Claims (Reckless Underwriting)

85.     The Relator incorporates by reference paragraphs 1 through 85 of its Complaint as if fully set forth herein.

86.     The United States of America seeks relief against Bank of America under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. §3729(a)(2) (2006), and, as amended, Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. §3729(a)(1)(B).

87.     As set forth above, from 2008 through the present date, Bank of America knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims with respect to the thousands of Fannie Mae and Freddie Mac loans that Bank of America falsely certified were eligible for Fannie Mae and Freddie Mac insurance.  Specifically, during this period, Bank of America knowingly submitted thousands of false individuals Fannie Mae

and Freddie Mac loan certifications to HUD representing, *inter alia*, that each loan was eligible for HUD mortgage insurance under the Direct Endorsement program. Bank of America submitted the false loan certifications to induce Fannie Mae and Freddie Mac to endorse the mortgages for insurance and to get HUD to pay false insurance claims when the mortgages defaulted. In addition, Bank of America submitted and caused to be submitted false records and statements to HUD in connection with claims that were submitted for Fannie Mae and Freddie Mac insurance for defaulted loans that Bank of America had falsely certified were eligible for Fannie Mae and Freddie Mac insurance.

88. A truthful individual loan certification for Fannie Mae and Freddie Mac endorsement is a condition of payment of Fannie Mae and Freddie Mac insurance on that loan. HUD paid insurance claims, and incurred losses, on these retail Fannie Mae and Freddie Mac loans that Bank of America falsely certified were eligible for HUD insurance.

89. By reason of the foregoing, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

### THIRD CLAIM
#### Violations of the False Claims Act
#### (31 U.S.C. §3729(a)(1) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(A))
#### Presenting or Causing False Claims to Be Presented (Self-Reporting)

90. The Relator incorporates by reference paragraphs 1 through 90 of its Complaint as if fully set forth herein.

91. The United States of America seeks relief against Bank of America under Section 3729(a)(1) of the False Claims Act, 31 U.S.C. §3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. §3729(a)(1)(A).

92.     As set forth above, from 2008 through the present date, Bank of America intentionally failed to self-report to HUD, as required, the Fannie Mae and Freddie Mac loans that it knew failed to meet the Fannie Mae and Freddie Mac loan program parameters, contained an unacceptable level of risk, and were not eligible for HUD Insurance.  Bank of America's failure to self-report these loans evidences Bank of America's intent to knowingly present or cause to be presented false or fraudulent claims for Fannie Mae and Freddie Mac insurance. Moreover, with knowledge that those loans were ineligible for HUD insurance, Bank of America submitted the claims or caused the claims to be submitted for, and was paid Fannie Mae and Freddie Mac insurance on, nearly all of those loans for which claims were submitted.  Likewise, with knowledge that those loans were ineligible for HUD insurance, Bank of America sold some of the loans to third parties knowing that the third parties would submit claims for insurance in the even these deficient loans defaulted.

93.     Bank of America knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, caused to be presented to an officer or employee of the United States of America, false and fraudulent claims for payment or approval.  Bank of America submitted false loan-level certifications to HUD to induce Fannie Mae and Freddie Mac to endorse these mortgages for Fannie Mae and Freddie Mac insurance and failed to self-report these mortgages that the bank knew failed to meet the Fannie Mae and Freddie Mac loan program parameters, contained an unacceptable level of risk, and were not eligible for HUD insurance.  Bank of America did so knowing that the third parties to whom Bank of America had sold these Fannie Mae and Freddie Mac loans or who were servicing these Fannie Mae and Freddie Mac loans would submit false claims for insurance when the loans defaulted.

94.     Bank of America knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented to an officer or employee of the United States of America, false and fraudulent claims for payment when it submitted claims for Fannie Mae and Freddie Mac insurance in connection with these defaulted loans that the bank knew failed to meet the Fannie Mae and Freddie Mac loan program parameters, contained an unacceptable level of risk, had not been self-reported to HUD, and were not eligible for HUD insurance.

95.     A truthful individual loan certification for Fannie Mae and Freddie Mac endorsement is a condition of payment of Fannie Mae and Freddie Mac insurance on that loan. HUD paid insurance claims, and incurred losses, on these loans that Bank of America wrongfully failed to self-report to HUD.

96.     By reason of the foregoing, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

### FOURTH CLAIM
**Violations of the False Claims Act**
**(31 U.S.C. §3729(a)(2) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(B))**
**Use of False Statements in Support of False Claims (Self-Reporting)**

97.     The Relator incorporates by reference paragraphs 1 through 97 of its Complaint as if fully set forth herein.

98.     The United States of America seeks relief against Bank of America under Section 3729(a)(2) of the False Claims Act, 31 U.S.C. §3729(a)(2) (2006), and, as amended, Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. §3729(a)(1)(B).

99.     As set forth above, Bank of America knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims for Fannie Mae and Freddie Mac

insurance with respect to at least the 6,320 loans that Bank of America knew failed to meet the Fannie Mae and Freddie Mac loan program parameters, contained an unacceptable level of risk, and were not eligible for HUD insurance.

100.    Between 2008 and the present date, Bank of America made numerous false statements and used numerous false records to get false claims for Fannie Mae and Freddie Mac insurance paid by HUD.  The false statements and false records that Bank of America made and/or used include, but are not limited to:  (1) Bank of America's annual certifications from 2002 through the current date submitted to HUD in which the bank certified *inter alia*, that it conformed to all regulations necessary to maintain its HUD-Fannie Mae and Freddie Mac approval, (2) Bank of America's self-reports of loans to HUD from 2001 through the current date, which knowingly omitted seriously deficient loans, and (3) Bank of America's loan level certifications for the loans which Bank of America knew were false after the QA review was performed on these loans and which were used to get false or fraudulent claims for Fannie Mae and Freddie Mac insurance paid for these loans.  In addition, Bank of America submitted and caused to be submitted false records and statements to HUD in connection with claims that were submitted for Fannie Mae and Freddie Mac insurance for defaulted loans that Bank of America had falsely certified were eligible for Fannie Mae and Freddie Mac insurance.

101.    A truthful individual loan certification for Fannie Mae and Freddie Mac endorsement is a condition of payment of Fannie Mae and Freddie Mac insurance on that loan. HUD paid insurance claims, and incurred losses, relating to these Fannie Mae and Freddie Mac mortgages that Bank of America falsely certified were eligible for HUD insurance and failed to self-report as required.

102.   By reason of the foregoing, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## FIFTH CLAIM
### Violations of the False Claims Act
### (31 U.S.C. §3729(a)(7) (2006), and, as amended, 31 U.S.C. §3729(a)(1)(g))
### Reverse False Claim (Self-Reporting)

103.   The Relator incorporates by reference paragraphs 1 through 103 of its Complaint as if fully set forth herein.

104.   The United States of America seeks relief against Bank of America under Section 3729(a)(7) of the False Claims Act, 31 U.S.C. §3729(a)(7) (2006), and, as amended, Section 3729(a)(1)(G) of the False Claims Act, 31 U.S.C. §3729(a)(1)(G).

105.   As set forth above, Bank of America knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used or caused to be made or used false records and/or statements material to an obligation to pay or transmit money or property to the United States, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.  The false statements and false records that Bank of America made and/or used to avoid its obligation to indemnify HUD for loans that the bank had internally identified as not meeting HUD's requirements and containing unacceptable risk include, but are not limited to:  (1) Bank of America's annual certifications from 2002 through the current date submitted to HUD in which the bank certified, *inter alia*, that it conformed to all regulations necessary to maintain its HUD-Fannie Mae and Freddie Mac approval, (2) Bank of America's self-reports of loans to HUD from 2001 through the current date, which knowingly omitted seriously deficient loans, (3) Bank of

America's loan level certifications which Bank of America knew were false after the QA review was performed on these loans, and (4) Bank of America's filing of claims for Fannie Mae and Freddie Mac insurance on those same loans.

106.    A truthful individual loan certification for Fannie Mae and Freddie Mac endorsement is a condition of payment of Fannie Mae and Freddie Mac insurance on that loan. The United States of America paid insurance claims, and incurred losses, as a result of Bank of America's false records and false statements that concealed its obligations to indemnify HUD.

107.    By virtue of the false records or statements made by Bank of America, the United States of America suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty as required by law for each violation.

Respectfully Submitted,

David G. Wasinger, SDNYBar # DW3825
The Wasinger Law Group, P.C.
1401 S. Brentwood Blvd., Ste. 875
St. Louis, MO 63144
PH: 314-961-0400
FAX: 314-961-2726
dwasinger@wasingerlawgroup.com

L:\O'Donnell.32286\Bank of America.002\Pleadings\Complaint 06-02-14.docx